# EXHIBIT A

**TaxMasters**
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

# CLIENT

# TAX SERVICES

# ENGAGEMENT AGREEMENT

# TaxMasters
### "We Solve Your IRS Problems."

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

October 20, 2008

Jeffery D. Delong
**Client Name**

**Address**
Ukiah, CA  95482
**City, State  Zip**

Home Phone

Mobile Phone
pacpc@hotmail.com
Email

This agreement, including all attached pages incorporated herein, will spell out the complete agreement and the complete terms of service between TMIRS Enterprises, Ltd. dba. TaxMasters (hereinafter "Firm"), and Client Named above (hereinafter "Client"). This agreement states the minimum total retainer for the services to be provided by Firm. Installment Arrangements, if any, are outlined in the attached schedule. Client agrees that Firm may correct any addition errors discovered at a later date and adjust any installment agreements pro-rata for such addition errors. If no amount is indicated for a service description below, Client and Firm agree that, based on information available as of the date of this agreement, Client either does not appear to need the service or Client has declined that service.

## RETAINER

| Service | Amount |
|---|---|
| Settlement Analysis (See Offer In Compromise information if applicable) | $ |
| Wage Garnishment Release or Reduction | $ |
| Collection Hearing (CDP, CAP or OIC Appeal) | $ |
| Lien Subordination | $ |
| ACS Collections Case | $ |
| Revenue Officer or Revenue Agent | $         (RO / RA / TC) |
| Income Tax Returns (Form: 1040 ) | $   Fed(200)/ST(50)x6yrs=$1,500.00 Years: 00,01,02,03,04,05,06 |
| All returns must be filed before work can proceed. Assumes W-2 only, and no compilation of records. | |
| IRS Audit; Audit Appeal; Tax Court Services | $ |
| Compliance Package | $ |
| Includes Corporate Formation, Payroll & Accounting Firm Service Referral | |
| IRS Consultation Fee | $   550.00(Trans – SP) |
| Installment Agreement or Uncollectible | $   950.00 Uncollectible |
| **Total** | $   3000.00 |

This engagement agreement including the attached pages fairly represents the agreement between the Client and Firm in all material respects. TaxMasters is Not a CPA Firm and TaxMasters is Not a Law Firm.

TMIRS Enterprises, Ltd., d.b.a. Tax Masters

By: James Arline

10/20/2008
Date

Client

(1)

Jeffery D. Delong
(Printed Name)

# TaxMasters

*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txinstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## Purpose of Agreement

This agreement addresses the provision of tax consulting services to Client regarding resolution of Client's Internal Revenue Service (hereinafter referred to as "IRS") problems and any known outstanding federal tax obligations that Client advises Firm exist under terms stated in the attached pages. This agreement is limited strictly to those services which Client requests in the agreement. No other services are implied or may be inferred by this agreement.

Firm will follow such procedures, ethical responsibilities, and processes as rise to the level of tax professionals. Every reasonable effort will be made to represent the best interests of Client and maintain confidentiality of Client information in all dealings with the IRS. In no case will Firm assist Client in any actions that are or may be, in the sole opinion of Firm, a criminal, unethical, or immoral act.

## Sub Contracted Services

Client agrees that Firm may, at its sole discretion, contract other companies for any of the services which Client has retained Firm to handle. The sub-contracting company may be or may not be affiliated with Firm in some form or manner including ownership. Client agrees that Client's relationship with such sub-contracting company is limited to that of beneficiary of the relationship. No client relationship other than that of confidentiality is created in this engagement or any amendments to this engagement.

Client expressly waives any and all claims for potential monetary damages against the subcontracting company whether such claim arises from actions taken or from failure to take any action by subcontracting company on Client's behalf. Further, in the event Client shall be deemed by a competent court of law to have a right to collect damages despite this agreement, such damages shall be limited to the figure of twenty percent (20%) of the actual fees paid by Client to Firm for the service or services creating the damages.

## Acknowledgements of Client and Firm

- Client acknowledges and agrees to the following:
  - Firm represents Client and is not an agent of and has no authority over the IRS;
  - Final decision on acceptance of any negotiated settlements rests with the IRS;
  - Any and all governmental fees required for submission, review, approval, acceptance, filing, issuance of documents or such other fees as may be imposed by the governmental entities involved in Client's case remain the sole responsibility of the Client. Client's refusal to pay such fees may cause delays or the governmental entity may suspend or terminate all discussions regarding Client's case and result in additional professional fees from such a delay. Client is solely responsible for the events associated with payment or non-payment of the government's fees;
  - Timeliness in Client response to Firm is critical to success of any matters before the IRS and for any negotiated settlements – delay in response, even when such delay is out of Client's control, can result in IRS rejection of all previously accepted negotiating positions causing the process to begin again and increasing Client's cost of this process including additional professional fees for the added services:
    - **Important Note:** IRS requests frequently allow only 10 or 15 days for response. It is important that you immediately read all IRS documents and contact us to discuss it. We should receive a copy of the documents from the IRS, but it is not a certainty. As a result, it is imperative that you contact us on receipt.
- Client affirms that it enters this agreement willingly.
- Client agrees that all fees under this agreement are due Firm without regard to the success or failure of the service rendered.
- Client agrees Firm is not obligated to begin providing services to Client until all fees are paid in full. Firm may begin providing services earlier than this date at its sole discretion without waiver of this provision or future right to invoke it.
- Client agrees and acknowledges:
  - Client retains sole responsibility for the accuracy of the financial data and other information presented to IRS.
  - Firm will not audit, review, or examine the financial information presented to IRS. – nor will Firm express any opinions or other forms of assurances on the financial or other information presented.
- Client indemnifies Firm for any omissions or errors in Client's data provided to Firm to develop the documents described in this agreement whether such omissions or errors were intentional or unintentional.
- Although the IRS will make exceptions, it is the general experience of Firm that the IRS will require that all tax returns be current and filed before the IRS will consider collection alternatives and garnishment relief. Client agrees that, in addition to payment of fees, Firm is not obligated to begin other services until all returns are complete. Should Client request and should Firm agree to begin other services before all required tax returns are complete and filed, Client is solely responsible for the failure of such efforts.

# TaxMasters
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## Services to be Rendered by Service Type

All retainer amounts assume the Client responds to all requests for documents in a timely manner. Client agrees to summarize and or compile such required information in a form to be reasonably specified by Firm or to separately compensate Firm for providing such services. No analysis, summary or compilation related services are anticipated in any services other than as specified. Client and Firm agree that the fees were determined assuming that may and all IRS and other governmental authorities will not take any adverse or unreasonable positions in pursuit of Client. All potential services are described below in the event Client should later need additional services not anticipated in the original agreement. This section is not intended to add or remove services client purchased in other sections of this agreement.

The description below is agreed by Client and Firm to fairly represent the anticipated scope of the services between the two parties:

1. Settlement Analysis
   o Firm will analyze Client financial data submitted in the form requested by Firm;
   o Firm will prepare a draft form of the IRS Form 433-A or 433-B using the Client provided financial data. Additional fees will apply if both Form 433-A and 433-B are required by IRS;
   o Firm will recommend to Client what Firm believes in its professional judgment to be the best alternative for Client of the various IRS programs including but not limited to Offer In Compromise, Partial Pay Installment Agreement, Installment Agreement, Uncollectible status, or, such other alternatives as may be now or become in the future available from the IRS.

2. Offer In Compromise (See Disclosure Attached for Costs and Additional Terms)
   o Firm will prepare the IRS Form 656 for submission of an offer in compromise with the IRS of federal tax obligations;
   o Firm will advise Client on the steps, if any, to take in response to IRS communication related to the offer in compromise submission provided Firm receives the IRS communication from either the IRS or Client;
   o Client is required to submit data and all IRS correspondence timely, accurately, and completely to Firm;
   o Client will advise Firm when Client receives correspondence from the IRS;
   o Client agrees to respond promptly to all inquiries from Firm;
   o Client acknowledges that any delay in response will result in delays in resolution of Client's IRS problems and may result in additional fees. Resubmission of IRS documents and filings that result from adverse actions by the IRS or due to Client's action or failure to act timely, completely, and accurately will result in additional fees for the additional work required to either resume or restore Client's case.

3. Reinstatement of Negotiated Settlement (See Disclosure Attached for Costs and Additional Terms)
   o Firm will contact the IRS to seek reinstatement of the settlement terms previously held by Client.
   o Client assumes all liability if IRS refuses to grant a reinstatement.
   o Should IRS require a new or updated financial disclosure such as Form 433-A, Firm will advise Client of the cost of Settlement Analysis services.
   o Should Client reject Firm's offer of additional services or not agree and complete payment timely resulting in IRS termination of discussions or resulting expiration of Client's regulatory rights in the matter, Client agrees that all services are satisfactorily completed in this matter.

4. Wage Garnishment Release or Reduction
   o Analyze client submitted financial data; obtain clarification, if needed, of any information submitted; contact the IRS via telephone once to obtain relief for which Client is eligible; negotiate amount of relief due Client with the IRS if appropriate; advise Client of the results; advise Client's employer if requested by Client.
     **Important Notes:** (1) Client's employer may or may not accept any communication from Firm regarding this matter. (2) Employer's frequently process payroll several days before the pay date – Client assumes all responsibility for timeliness of any required communication; (3) The IRS often fails to send notification of garnishment rescission to employers. Client is solely responsible for the consequences of the IRS' actions or failure to act.
   o If the IRS refuses to follow IRS regulations or IRS manual rules and Firm is required to make additional phone calls, Client will be invoiced at the Firm's then prevailing rate for second or subsequent phone calls;
   o Client is responsible for notifying Firm if the Client's employer does not receive the garnishment release order from the IRS. We will follow up after being notified by the Client of the IRS failure to submit the release or reduction to the Client's employer. The cost of this follow up service will be invoiced to Client at the Firm's then effective prevailing rate for such services. Payment for this service will be due before other services will commence or payments from other services will be applied to these invoices at Firm's sole discretion.

5. Collection Hearing (CDP, CAP, or OIC Appeal)

# TaxMasters

*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

- CDP Hearing: Prepare CDP hearing request form and submit to the IRS; attend the hearing; negotiate with hearing officer on behalf of client for whatever relief may be available to the client; advise client of results of hearing.
- CAP Hearing: Prepare CAP hearing request and submit to the IRS; attend the hearing; negotiate with hearing officer on behalf of client for whatever relief may be available to the client; advise client of results of hearing.
- OIC Appeal: Prepare appeal notification and submit to the IRS; attend the hearing; negotiate with hearing officer on behalf of client for whatever relief may be available to the client; advise client of results of hearing.

6. Lien Subordination
   - Using information provided by Client, Firm will attempt to obtain a subordination of lien so that Client may proceed with whatever transaction is anticipated and that requires lien subordination.
   - Firm makes no representation or warranty as to the acceptable nature of the terms that IRS may impose in agreeing to the lien subordination.
   - Client represents that Client is will provide complete disclosure to Firm of all required financial information.
   - If Release of Federal Tax Liens is the most viable option in Firm's judgment at the time, Firm will obtain release of federal tax liens from IRS personnel after resolution of the tax debt causing the lien to be filed.
   - Resolution of the tax debt is excluded from this service.

7. Revenue Officer or ACS Collections
   - Discussions with Client and IRS agent in the case as it progresses
   - Analysis of open items due the IRS in the case (preparation of un-filed returns, CAP or CDP appeal hearings, OIC appeals, and such other services as may be needed are at additional fees)
   - Negotiation on behalf of client with IRS agents to establish payment plans and other alternatives to payment plans. Preparation of tax returns and CAP, OIC, or CDP appeals will require additional fees.

8. Income Tax Returns to File.
   - Assumes W-2 only type return – maximum of 2 form W-2's. Additional charges will apply if number of W-2's is greater than 2 per tax return.
   - Additional required schedules, statements, sub schedules, worksheets, or documents that are necessary to be submitted with the tax return to ensure a complete and accurate return are at an additional fee. Fees vary – begin at $5.00 and increase based on complexity of the schedule or other document. Current fee schedule in force at time of preparation will apply.
   - Firm will advise Client of the fee adjustment, if any, after reviewing the final documents required to prepare the tax return completely and accurately. Firm may, at is sole discretion, begin completion of returns before advising client of any fee adjustments.
   - Assumes its compilation, sorting, or analysis of records.
   - Any re-runs of return due to omitted information, any organizing or gathering and sorting or records for Client, any unusual or required additional follow up contacts necessary to complete the return, and any other services required to prepare and gather documents to enable preparation of a complete and accurate return will be at additional cost.
   - Client agrees to provide full and complete disclosure of all information deemed relevant by Firm in preparation of the tax returns. Firm may suspend completion of tax returns until such full and complete disclosure is provided. Client is solely responsible for the effects of such a suspension should it become necessary.

9. IRS Audit OR IRS Audit Appeal OR Tax Court Services
   - IRS Audit
     1. Audit representation at IRS offices or in Firm offices if a field audit by IRS.
     2. Consult with and advise Client on actions that should be taken to prepare records for audit.
     3. Consultations with Client on results of audit visit with IRS and discussion of any actions needed based on the audit result.
     4. Should IRS take an unreasonable position in Client's case or should informal appeals and research be needed for discussion with IRS audit management, additional fees will apply.
   - IRS Audit Appeal
     1. Appeal of IRS audit findings or resolution at manager level of auditor or audit manager objections.
     2. Preparation of appeal documents for first level appeal.
     3. Consultations with Client on results of audit appeal including discussion of any actions recommended based on the appeal results.
   - Tax Court Services
     1. Retain outside counsel to prepare and file the Tax Court petition.
     2. Provide assistance to outside counsel with petition preparation as needed.
     3. Attend Tax Court hearings with outside counsel as needed.

# TaxMasters

*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

- o Client agrees that Firm may substitute the above services as needed to pursue the best options on the client's audit. If more than one of the above options will apply, Client will be responsible for any additional fees. Such additional work requiring multiple services will only be done with Client's advance approval.

10. Bookkeeping Services
- . Prepare summarized income and expense information on an income tax basis for Client using Client's original source records.
- o Prepare depreciation schedules, if needed in Firm's opinion.
- o Reconcile bank accounts, if needed in Firm's opinion.
- o Prepare asset and liability schedules, if needed in Firm's opinion.
- o Firm is not a CPA firm and will not provide any form of opinion or transmittal letter to go with the above mentioned schedules of financial information.

11. Compliance Package
- o Introduce Client to an accounting company that will provide needed business accounting services
- o Introduce Client to a payroll service company
- o Client to execute separate agreement regarding services and fees with each of the payroll and accounting companies
- o Corporate Formation Services by Firm
  1. Prepare formation documents.
  2. Register corporation with state authorities.
  3. Obtain Federal and State Tax Identification Number from IRS if requested by Client.
  4. File an election to be treated as an S Corporation with the IRS if requested by Client.
  5. File an election to be treated as an S Corporation with the state revenue authorities if available in client's state and if requested by Client.
  6. Prepare corporation book of records for Client including seal if requested by Client.
  7. Provide all filing documents used in formation to Client.

12. IRS Consultation Fee
- o Transcript Consultation: prepare power of attorney form 2848 or equivalent; contact IRS by phone once; obtain IRS income and withholding information from the IRS and obtain tax filing status and tax debt information from IRS; inform client of results of this contact.
- o Report Consultations: obtain data and information from client; contact IRS once if necessary; conduct analysis of case; and prepare recommendation where appropriate of action to be taken by Client.
- o Other services as agreed in writing (SP).

13. Installment Agreement or Uncollectible
- o Using Settlement Analysis information, request uncollectible status with the IRS on behalf of the Client if requested by Client AND if Client qualifies according to regulations in place as of the time of the request.
  1. Client acknowledges that the IRS may annually review the Client's uncollectible status and may return the Client to active collections at the IRS' sole discretion and with little or no warning to Client.
  2. Client agrees that Firm will provide this service once. If unsuccessful or if IRS later terminates the status and returns Client to active collections, Firm has no additional obligation.
  3. Client agrees that if Firm is unable to obtain uncollectible status with the IRS for Client, Firm may agree to a pay plan that is based on Client's financial data as provided by Client during the Collection Alternatives analysis. If Client rejects this pay plan based on the financial data, Firm and Client agree that Firm has met its obligations to Client in this service in all material aspects.
  4. If Client has not purchased a Settlement Analysis, Firm is not obligated to conduct a complete financial analysis and may rely on Client providing complete and accurate information. Firm will then make a simple and cursory initial review of Client financial data provided.
- o Using Settlement Analysis information, if this additional service is purchased, request an installment agreement with the IRS on behalf of Client.
  1. Installment agreement may be either a partial pay agreement or a standard agreement or such other installment agreements as may now exist or, at Firm's sole discretion to include the service, such other installment arrangements as may be created in the future by the IRS
  2. It is anticipated that after conducting the Settlement Analysis, Firm will contact the IRS once to establish the payment plan. Second or additional calls may result in additional fees at Firm's sole discretion.
  3. If Client has not purchased a Settlement Analysis, Firm is not obligated to conduct a complete financial analysis and may rely on Client providing complete and accurate information. Firm will then make one attempt at obtaining uncollectible status for Client after Firm makes a simple and cursory initial review of Client financial data provided.

# TaxMasters
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmsfr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## Minimum Fees, Minimum Retainer, and Additional Fees

The MINIMUM RETAINER stated herein for professional services is the minimum fee for the service indicated. It is not a flat fee for the service. Client and Firm agree that should a stated service later be found not to be needed, Firm may, at its sole discretion, refund the amount of the stated retainer for that service if it has been paid, void the service and not collect the amount if unpaid by Client, apply the retainer to additional services needed by Client, or hold the amount of the retainer on the unneeded service as a credit against future services Client may need.

All retainer amounts assume the Client responds to all requests for documents in a timely manner and that all required tax returns of any kind required of the Client have been filed with the appropriate governmental authorities and that the governmental authorities will not take any adverse or unreasonable positions in pursuit of Client and that the IRS or other governmental entity will perform their duties with all due and reasonable professionalism. Client is solely responsible for any additional fees and costs incurred should the actual time required on Client's behalf exceed the normal budgeted amount for such services due to any of the above or for other reasons beyond Firm's control.

All fees quoted are a retainer and a minimum fee to complete that service. Additional fees will apply (1) if Client fails to fully disclose all relevant data and information; (2) if Client requests or demands regular status reports in excess of those anticipated by Firm; (3) if Client requests or requires excessive consultations (as defined by Firm at its sole discretion) either by phone or in person; (4) service requirements on Client's case exceed the norm due either to Client needs or to the requirements of the IRS or other governmental entities pursuing Client's case. The additional professional fees when applicable will be based on actual time required and the Firm's professional hourly fee rates that range from fifty to eight hundred and fifty dollars per hour depending on the type of service and the staff providing the service. Rates are subject to change without requirement of advance notice. Invoices will be presented monthly or more frequently at Firm's discretion. Invoices are due on presentation. Firm's obligation to continue to provide services is strictly contingent upon Client's payment of invoices on or before the due date on the invoice.

Client agrees that, should Client seek the assistance of any third party in the event of disagreement with Firm, all time spent in discussion with such third party shall be charged against the budgeted time purchased by Client for services and shall reduce the time available for providing of services to Client. Client further agrees that should such an event occur, Client agrees to hold Firm harmless for any and all disclosure of Client information required to resolve such disagreement. Client agrees that Client provides his or her permission to disclose all information in Firm's files about Client to such third party without need of additional agreement to disclose and that Client waives all confidentiality expectations of Firm in such an event.

Client agrees that collection costs including reasonable attorney's fees and a monthly late fee of 1.5% or the maximum allowed by law, of the amount due may be added to any invoices unpaid after the due date or in the event Client defaults on payment of the retainers agreed herein.

## Client's Early Termination of Agreement

Client may terminate this agreement at Client's discretion by providing Client's notice in writing to Firm. In the event of termination by Client, the minimum professional fees due for services rendered or to be rendered will be the higher figure of: (1) the minimum total retainer specified above and the actual fees for any other services performed - or – (2) the actual time expended by Firm at standard billing rates. If Client has paid more than the minimum fee as determined herein, a refund will be paid. Client agrees to remit any balance in full with its termination notice or to permit any remaining balance to be drafted in full using the payment method established in the installment agreement.

## Other Terms: Damages; Arbitration; Jurisdiction

Travel and other expenses, if required, are excluded and subject to prior approval of Client. Travel to local IRS offices is included in the fees provided herein.

Unless otherwise agreed in writing, the above fees and this engagement letter properly executed by Client shall be remitted to TaxMasters before Firm is obligated to provide any services described herein.

The parties agree that the obligation of Firm to render professional services to Client is expressly contingent upon full payment of fees provided under this agreement.

Headings, underlined passages, or bold lettering in this agreement are provided for ease of reference and emphasis on the passage. Client and Firm agree that no other purpose to these visual aides is intended or may be inferred.

Client agrees to conduct himself herself in a professional manner while in Firm offices or while communicating with Firm staff, in person, by telephone, or by any electronic means. Should Client's behavior become abusive, in Firm's sole discretion, Firm retains the right to terminate the agreement without refund.

7

# TaxMasters

*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

Damages – Client agrees that damages are limited in all causes of action and in all claims that can be reasonably anticipated in this matter should Client and firm become engaged in litigation over this agreement or the services provided. In the event of litigation, Client agrees that damages sought against Firm, including attorney's fees, shall be limited to the amount of fees paid by Client pursuant to this agreement and or any validly executed subsequent supplemental engagement agreement, for all causes of action brought against Firm, should Client prevail in any and all claims or causes of action.

Arbitration Agreement:

- Client agrees that any and all claims, demands, disputes, or controversies of any kind or nature that Client has concerning any of the negotiations leading to the purchase of the services, terms and provisions of the sale, engagement agreement, arrangements of payment, purchase of service contracts, the performance of the engagement agreement or services, or any other aspect of the services from Firm shall be settled by binding arbitration conducted pursuant to the provisions of Title 9 of the United States Code Chapter 1 et seq. and according to the Rules of the American Arbitration Association.

- Client agrees, covenants, and contracts that there shall be no class arbitration between the parties and the only parties to any disputes or controversies to be arbitrated as more particularly described herein shall be the Client and Firm.

- Either party may demand arbitration by filing with the American Arbitration Association a written demand for arbitration along with a statement of the matter in controversy. A copy of the demand for arbitration shall simultaneously be served upon the other party. The Client agrees that the arbitration proceedings to resolve all such disputes shall be conducted in Houston, Harris County, Texas. Client agrees to bear all costs of arbitration. Client agrees to keep confidential the results, decisions, and conversations and all communications in connection with the arbitration proceedings and or Arbitration Agreement. Firm may seek damages and or injunction against the Client for any violations of the confidentiality requirements set forth herein.

- Client and Firm agree that all prior contracts and agreements between the parties of any kind and executed at any time prior to the date of this agreement shall, as part of this agreement, be deemed to be modified to include and adopt the arbitration terms of this agreement and to remove the litigation provisions as if all of the prior agreements or contracts originally contained these provisions.

8

**TaxMasters**
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## INSTALLMENT ARRANGEMENT

### Pre-Authorized Payments by Credit Card

**Credit Card Information:**   Visa  MC    Discover    AMEX

I,   Jeffery D. Delong  , authorized user of credit card number ▮▮▮▮ that expires ▮▮▮▮ with card code of ▮▮▮▮ and billing address of ▮▮▮▮ Ukiah, CA  and billing Zip code of   95482   acknowledge the transaction in the amounts specified below with the merchant whose location is Houston, Texas on the transaction dates specified below and request my bank release these funds to the merchant processing bank in order to credit the merchant for any chargeback dispute on this item. Authorization to charge the account below for service fees is given irrevocably.

Card Number:  ▮▮▮▮
Card Code:  ▮▮▮
Billing Zip:  95482           Expires: ▮▮▮▮
                Billing Address:  ▮▮▮▮ Ukiah, CA

Total of Services:          $   3000.00
Less: Down Payment       $   3000.00  10/20/08
Balance Due:              $     00.00

*Client may pre-pay installments without penalty at any time.*

| | Amount | Due Date: | | Amount | Due Date: |
|---|---|---|---|---|---|
| 1. | $ | | 5. | $ | |
| 2. | $ | | 6. | $ | |
| 3. | $ | | 7. | $ | |
| 4. | $ | | 8. | $ | |

Installment Total:   $   00.00
(Should equal amount of Balance Due Above)

Cardholder Signature            Jeffery D. Delong            10/20/2008
                                Cardholder Name              Date

9

## TaxMasters
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmsfr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## INSTALLMENT ARRANGEMENT

### Pre-Authorized Payments by Bank Draft

**Checking Account Information:**

Client Name: _Jeffery D. Delong_     Bank Name: _____
Bank Address: _____     Bank Phone: _____
Routing #: _____     Checking Account #: _____

Terms: Client requests that pre-authorized checking drafts be created on the dates of the installment schedule below. Such drafts will not require signature of Client. Unless another account is indicated, Client instructs that the account used for the initial payment is the drafting account. Client is responsible for timely payment if pre-authorized check is not honored for any reason. Client requests that the above bank release the funds as requested below and waives all disputes, changes, and stop payments with above bank now or in the future. **Authorization is given irrevocably. Payment amounts to change to pro-rata amount on remaining installments if supplemental billing occurs.**

Total of Services:       $    3000.00

Less: Down Payment     $   3000.00  10/20/08

Balance Due:           $    00.00

Client may pre-pay installments without penalty at any time.

| | Amount: | Due Date: | | Amount: | Due Date: |
|---|---|---|---|---|---|
| 1. | $ | | 5. | $ | |
| 2. | $ | | 6. | $ | |
| 3. | $ | | 7. | $ | |
| 4. | $ | | 8. | $ | |

Installment Total:   $    00.00
(Should equal amount of Balance Due Above)

_____        _Jeffery D. Delong_        _10/20/2008_
Accountholder Signature        Accountholder Name        Date

Attach Voided Check Here

# TaxMasters
*"We Solve Your IRS Problems."*

Phone: (281) 497-5937
Fax: (713) 463-2900
www.txmstr.com

900 Town & Country Lane
Suite 400
Houston, Texas 77024

## Garnishment Disclosure
### (Applicable if Garnishment Relief is a selected service)

Except for the tax returns that Firm was engaged to prepare, I/We have filed all required tax returns for tax years ended to the date of engaging Firm at least sixty (60) days prior to the date of the engagement. I/We have noted any exceptions to this statement below. If I/We have left it blank, Firm is advised that the above statement is true and complete.
Not Filed as of 60 days prior: _____
(Attach separate sheet if needed.)

## Offers In Compromise Disclosure
### (Applicable if Client desires to submit or reinstate an Offer in Compromise)

Client agrees that the following fee will be paid to Firm at the time of submission to the IRS of the Client's Offer In Compromise IRS Form 656 or its then effective equivalent if substantially equal in service requirements (prepared only on IRS request for reinstatements). This fee is intended to pay only for the submission and management of the submission of the Offer In Compromise or to request a reinstatement of a previously approved offer in compromise. Any required financial analysis of Client financial position or appeals of IRS actions in the event this offer in compromise or reinstatement is rejected for any reason are not included in this service fee.

Fee Amount: $ _____ (Fee is due in Money Order, Check, or Cashiers Check before submission of Offer In Compromise)

_____
Client Signature

10/20/2008
Date

Jeffery D. Delong
Client Name

_____
Spouse Signature

_____
Spouse Name

11



# Next Process in Handling Your Case

Once again, thank you for using TaxMasters for solving you Federal and/or State Tax dilemma. Below are the next following steps and the proper way of getting information concerning on your particular case.

1. After documents have been sent to you please return the signed documents to the following fax number: <u>713-463-2924</u> or email it to **james.arline@txmstr.com**
2. Now that you have become a TaxMasters client, within the next seven (7) business days, one of our case coordinators will contact you to introduce the next steps of the process.
3. A Case Coordinator with be in contact with you at least once a month to provide a progress report.

## To Contact the Operation in Regards to Your Case:

Direct Contact Number to TaxMasters Operations Department:

# 1-800-682-3679 Dial Extension #1102
# Your Personal Client ID # is: <u>E3126</u>

This will direct you to the Operations Department cue where one of our case coordinators can discuss your case with you if you have any questions.

Once again, thank you for using TaxMasters for solving your Tax dilemma.

*James R. Arline*
Nationwide Number: 888-497-5937 ext 3525
james.arline@txmstr.com

The information in this document may include confidential and/or client privileged communications. This document is intended to be reviewed only by the individual or individuals named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, use, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Any use, publishing, copying, disseminating, forwarding or other use is prohibited as the content remains the property of the author.

Form **2848**
(Rev. March 2004)
Department of the Treasury
Internal Revenue Service

**Power of Attorney and Declaration of Representative**

▶ Type or print. ▶ See the separate instructions.

OMB No. 1545-0150

For IRS Use Only
Received by:
Name
Telephone
Function
Date

**Part I**   Power of Attorney

Caution: Form 2848 will not be honored for any purpose other than representation before the IRS.

**1 Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

Taxpayer name(s) and address

Jeffery D. Delong

Ukiah, CA 95482

Social security number(s) | Employer identification number

Daytime telephone number | Plan number (if applicable)

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2 Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Lekshmy Ravindranathan 900 Town & Country Ln, Ste 400 Houston, TX 77024 | CAF No.    7805-93473R Telephone No.   281-205-0654 Fax No.   713-465-8034 Check if new: Address ☐   Telephone No. |
| Name and address Autry Griggs 900 Town & Country Ln, Ste 400 Houston, TX 77024 | CAF No    0303-86583R Telephone No.   281-205-0654 Fax No.  713-465-8034 Check if new: Address ☐   Telephone No. |
| Name and address Teresa K. Pitre 900 Town & Country Ln, Ste 400 Houston, TX 77024 | CAF No.    0303-94322R Telephone No.   281-205-0654 Fax No.  713-465-8034 Check if new: Address ☐   Telephone No. |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3 Tax matters**

| Type of Tax (Income, Employment, Excise, etc.) or Civil Penalty (see the instructions for line 3) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) (see the instructions for line 3) |
|---|---|---|
| Income Tax | 1040 | 1983 thru 2008 |
| Civil Penalty | 1040 | 1983 thru 2008 |

**4 Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific uses not recorded on CAF. - - - - - - - - - - ▶ ☐

**5 Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative, the power to sign certain returns, or the power to execute a request for disclosure of tax returns or return information to a third party. See the line 5 instructions for more information.

Exceptions. An unenrolled return preparer cannot sign any document for a taxpayer and may only represent taxpayers in limited situations. See Unenrolled Return Preparer on page 2 of the instructions. An enrolled actuary may only represent taxpayers to the extent provided in section 10.3(d) of Circular 230. See the line 5 instructions for restrictions on tax matters partners.

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: _____

_____

_____

**6 Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, BUT NOT TO ENDORSE OR CASH refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ▶

For Privacy Act and Paperwork Reduction Notice, see page 4 of the instructions.    Cat. No. 11980J    Form **2848** (Rev. 3-2004)

Form 2848 (Rev. 3-2004)

Page 2

7 **Notices and communications.** Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2.

  a If you also want the second representative listed to receive a copy of notices and communications, check this box ▶ ☐

  b If you do not want any notices or communications sent to your representative(s), check this box �- - - - - - - ▶ ☐

8 **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here - - - - - - - - - - - ▶ ☐
YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.

9 **Signature of taxpayer(s).** If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

▶ IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.

| Signature | Date 20 OCT 08 | Title (if applicable) |
|---|---|---|
| Jeffery D. Delong | ☐☐☐☐☐ | |
| Print Name | PIN Number | Print name of taxpayer from line 1 if other than individual |

| Signature | Date | Title (if applicable) |
|---|---|---|
| | ☐☐☐☐☐ | |
| Print Name | PIN Number | |

**Part II.   Declaration of Representative**

**Caution:** Students with a special order to represent taxpayers in Qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program, see the instructions for Part II.

Under penalties of perjury, I declare that:

• I am not currently under suspension or disbarment from practice before the Internal Revenue Service;

• I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;

• I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and

• I am one of the following:

  a Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

  b Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.

  c Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.

  d Officer—a bona fide officer of the taxpayer's organization.

  e Full-Time Employee—a full-time employee of the taxpayer.

  f Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).

  g Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d) of Treasury Department Circular No. 230).

  h Unenrolled Return Preparer—the authority to practice before the Internal Revenue Service is limited by Treasury Department Circular No. 230, section 10.7(c)(1)(viii). You must have prepared the return in question and the return must be under examination by the IRS. See Unenrolled Return Preparer on page 2 of the instructions.

▶ IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED. See the Part II instructions.

| Designation—Insert above letter (a–h) | Jurisdiction (state) or | Signature | Date |
|---|---|---|---|
| b | 054550 | | |
| c | 87950 | | |
| c | 85969 | | |

Form 2848 (Rev. 3-2004)

Form **8821**

(Rev. April 2004)
Department of the Treasury
Internal Revenue Service

## Tax Information Authorization

► Do not use this form to request a copy or transcript of your tax return.
Instead, use Form 4506 or Form 4506-T.

OMB No. 1545-1165

**For IRS Use Only**

Received by:
Name
Telephone ( )
Function
Date / /

**1 Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

Taxpayer name(s) and address (type or print)

Jeffery D. Delong

Ukiah, CA 95482

E3126

Social security number(s)

Employer identification number

Daytime telephone number
( )

Plan number (if applicable)

**2 Appointee.** If you wish to name more than one appointee, attach a list to this form.

Name and address

Nikita Nichols
900 Town and Country Ln Ste 400
Houston, TX 77024

CAF No. 0304-91783R
Telephone No. 281-265-0654
Fax No. 713-463-2981

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

**3 Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a) Type of Tax (Income, Employment, Excise, etc. or Civil Penalty) | (b) Tax Form Number (1040, 941, 720, etc.) | (c) Year(s) or Period(s) (see the instructions for line 3) | (d) Specific Tax Matters (see instr.) |
|---|---|---|---|
| Income Tax | 1040 | 1983 thru 2008 | All Tax Matters Can Be Discussed |
| Civil Penalty | 1040 | 1983 thru 2008 | All Tax Matters Can Be Discussed |

**4 Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 3. If you check this box, skip lines 5 and 6 ► ☐

**5 Disclosure of tax information** (you must check a box on line 5a or 5b unless the box on line 4 is checked):

a If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ► ☐

b If you do not want any copies of notices or communications sent to your appointee, check this box - - - ► ☐

**6 Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you must attach a copy of any authorizations you want to in effect and check this box - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ► ☐

To revoke this tax information authorization, see the instructions on page 3.

**7 Signature of taxpayer(s).** If a tax matter applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

► **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

Signature _____   Date 20 OCT 08

Jeffery D. Delong

Print Name _____   Title (if applicable) _____

☐☐☐☐☐ PIN number for electronic signature

Signature _____   Date _____

Print Name _____   Title (if applicable) _____

☐☐☐☐☐ PIN number for electronic signature

For Privacy Act and Paperwork Reduction Act Notice, see page 4.     Cat. No. 11596P     Form **8821** (Rev. 4-2004)

# EXHIBIT B

STATE OF CALIFORNIA          §
                             §
COUNTY OF LOS ANGELES        §

BEFORE ME, the undersigned notary public, on this day personally appeared Denise J. Miranda who proved herself to be the person whose name is subscribed hereon through her California Drivers License which contained her photograph and signature, and who after being by me duly sworn, upon her oath deposed and said:

"On April 20 2010 I listened to the attached audio recordings of the my conversation with persons at Taxmasters and have reviewed a transcript of that recording. Both the audio recording and the transcript are an accurate record of my conversation with persons at Taxmasters, which took place on June 18, 2009, pursuant to my call to Taxmasters at 1-888-497-5973 to seek help for a tax problem. Very shortly - within an hour or two of completing this call- I called Taxmasters because I had changed my mind and decided I wanted to wait before committing to use their services. The Taxmasters representatives that I spoke with were very uncooperative and told me my bank card had already been charged. They told me I had to contact to the billing department to cancel and gave me a phone number which did not go through to the billing department. I called back again and was told to send an email, which I did. I sent multiple emails but never received a response confirming my cancellation. When I was finally able to speak with a person in the billing department who told me that my written request for a refund would have to be reviewed by her and several other persons in the company. Four days later on June 22, 2009 my bank account was charged $1500.00 by Taxmasters. I continued attempting to contact Taxmasters by phone and via email but never received a response to my refund request. Eventually I was able to work with my bank to reverse the charges that Taxmasters had placed against my account. I never received any services from Taxmasters, and tried to cancel the same day I signed up, but Taxmasters was unwilling to return my money to me.

"Further affiant sayeth not."

Denise Miranda

SUBSCRIBED AND SWORN TO before me on the 20th day of April, 2010 by DENISE MIRANDA who proved to me on basis of satisfactory evidence to be the person who appeared before me

CHRISTI M. PIDO
Commission # 1848385
Notary Public - California
Los Angeles County
My Comm. Expires Apr 26, 2013

Notary Public in and for the State of California

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPTION OF SALES CALL

BETWEEN TAXMASTERS, INC. AND DENISE MIRANDA

ON JUNE 18, 2009

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIBED BY: JANE DEMARS
Job No. 85268



**ORIGINAL**
Sunbelt Reporting & Litigation Services

DALLAS/FORT WORTH
12160 Preston, Ste. 303
Dallas, Texas 75248
214-747-6702

CORPORATE OFFICE
6575 West Loop South, Ste. 563
Houston / Bellaire, Texas 77401
713-667-0763

SAN ANTONIO
8200 IH-10 West, Ste. 1900
San Antonio, Texas 78230
210-582-0703

CORPUS CHRISTI
713 N. Carancahua, Ste. 700
Corpus Christi, Texas 78475
361-882-0263

AUSTIN
1016 La Posada Dr., Ste. 294
Austin, Texas 78752
512-458-9100

EAST TEXAS
102 North College, Ste. 1024
Tyler, Texas 75702
903-593-3212

1-800-966-6753 · www.sunbeltreporting.com

2

1    UNIDENTIFIED FEMALE: Thank you for

2    calling Taxmasters. If you are already a client, please

3    press five to be connected to client services.

4    Otherwise, please hold while we connect you with the

5    next available tax consultant. All calls may be

6    monitored or recorded for quality assurance.

7         JD: Thank you for calling Taxmasters.

8    This is JD speaking. May I ask who I'm speaking with?

9         DENISE MIRANDA: Hi, JD. My name is

10   Denise.

11        JD: Hey, Denise. How you doing?

12        DENISE MIRANDA: I'm, I'm not doing too

13   well.

14        JD: Uh-oh. Tell me what's going on so I

15   can --

16        DENISE MIRANDA: Um.

17        JD: -- see if I can help you out.

18        DENISE MIRANDA: This is my first audit.

19   I was contacted in May --

20        JD: Okay.

21        DENISE MIRANDA: -- via letter.

22        JD: Okay.

23        DENISE MIRANDA: Mail letter and I had my

24   first appointment with the auditor yesterday, and it

25   lasted a whole entire day, and I can't do, I don't think

3

1    I can do this by representing myself.  It's just way too

2    complicated.

3                JD:  Okay.

4                DENISE MIRANDA:  And I think, I think

5    there's a lot of unfair things going on, but I'm not too

6    sure, you know, because I don't know.

7                JD:  That's exactly why they like you to

8    represent yourself because you don't know.

9                DENISE MIRANDA:  Yeah.

10               JD:  And that's okay.  That's okay.  You

11   know, we've got tax attorneys that went to school for

12   seven years to learn everything that needs to be known,

13   and they still learn something new every day.  So --

14               DENISE MIRANDA:  Yeah.

15               JD:  -- don't feel alone.

16               DENISE MIRANDA:  Okay.

17               JD:  All right.  So tell me, let's talk

18   about the audit and let's talk --

19               DENISE MIRANDA:  Okay.

20               JD:  Well, let's first, let's talk about

21   the reason for the audit.  There's always typically

22   usually a reason for the audit.  What do you think --

23               DENISE MIRANDA:  He wouldn't --

24               JD:  What --

25               DENISE MIRANDA:  He wouldn't give me a

4

1  direct answer why. Everything that we kind of went
2  over, he -- it didn't seem like there was anything wrong
3  with it. He did say something that I didn't file, I had
4  a CD account with Washington Mutual --
5         JD: Uh-huh.
6         DENISE MIRANDA: -- which collected $400
7  interest.--
8         JD: Uh-huh.
9         DENISE MIRANDA: -- and that's something
10  I didn't, I don't remember filing, so I think it could
11  have, that was probably the red flag.
12         JD: Okay.
13         DENISE MIRANDA: Other than that, we went
14  over everything and everything was fine until he opened
15  my, my bank statements of my personal checking account.
16  He added up all of the withdrawals and all of the
17  deposits. Some of those withdrawals were, were cash --
18  I mean not withdrawals, the deposits were cash, and he
19  said that those, the IRS sees all of those as revenue,
20  because I also have a side business. So he said that
21  those, I was supposed to claim that for my side
22  business, which it wasn't, because it was all -- a lot
23  of that is personal with like my mom helping me with
24  rent. Some of it were birthday gifts. Some of it, I
25  know some of it must have even been from a student loan.

5

1          JD:  Uh-huh.

2          DENISE MIRANDA:  So I asked him, you

3  know, if there's any way I could prove it, and he said

4  to get bank deposits.  Well, the bank deposits don't

5  show what exactly the income is from.  It just shows

6  cash deposits.

7          JD:  Uh-huh, uh-huh, uh-huh.

8          DENISE MIRANDA:  So he's, he added it up

9  and it was $1,100, and I'm getting penalized on that,

10  and he wants to have another meeting to go through my

11  other bank statements from '06 and '08.

12          JD:  Okay.  So, so '06, '07 and '08 are

13  the three years that he's trying to audit you for, then.

14          DENISA MIRANDA:  Right.

15          JD:  Okay.  Okay.  All right.  Here's,

16  here's what needs to happen.  Okay.  I think you've got,

17  a, a firm understanding that audits are guilty until

18  proven innocent.

19          DENISE MIRANDA:  Uh-huh.

20          JD:  And then, and I think you understand

21  the need for representation.

22          DENISE MIRANDA:  Yes.

23          JD:  Okay.  Now, if you're being audited

24  for three years, which is the typical time frame that

25  they audit you for, so we need to say it's '06 to '08.

6

1   Okay? Okay.  Now, have, do you have any idea of what

2   the fallout's going to be yet?

3             DENISE MIRANDA:   No idea.  He's not

4   giving me any type of lead for that at all, even when I

5   asked.  He's like, (inaudible) this attorney thing, he's

6   just trying to go through every single little thing, so.

7             JD:  Was he asking a bunch of odd

8   questions?

9             DENISE MIRANDA:  What do you mean by odd?

10  I mean he asked so many questions.  I --

11            JD:  Generic, generic questions, and then

12  you answer and he goes uh-huh uh-huh uh-huh, and he

13  writes it down on his pad.

14            DENISE MIRANDA:  Yes.  That, that was the

15  whole audit, how the entire audit was.

16            JD:  Okay.  What happens there is is --

17  And these guys are trained professionals.  Okay?  What

18  they do is is they, they try to ask you a bunch of

19  generic questions and based on your answers is whether

20  or not they can deny any of your claims that you've made

21  on your return, and then what they do is they go back

22  and remove those deductions, charge you for what you

23  were paid on them, plus interest and penalties.  So

24  typically, for one year of -- And they only audit you,

25  okay, I don't give a crap what they say, they always say

7

1  oh, it's random.

2           DENISE MIRANDA:  Yeah.

3           JD:  Bull.  It's not random.  Okay?

4  They, they select you based on the amount of money they

5  think they can get from you.

6           DENISE MIRANDA:  Got it.

7           JD:  So if they've already identified

8  somewhere in the three years of returns, then they're

9  not going to waste their time on, you know, a couple

10 thousand dollars.  They're going to waste their time on

11 20, 30, $40,000.

12          DENISE MIRANDA:  Yeah.

13          JD:  Okay.

14          DENISE MIRANDA:  It's -- Yeah.  See, the

15 thing is I've been filing for a family with me and my

16 fiance, and I, I have a CD account that has quite a good

17 amount, and, and I know, you know, what scared me is

18 that he can seize all of that.

19          JD:  Yeah, he can.

20          DENISE MIRANDA:  He can seize all of it.

21          JD:  Yes, ma'am.

22          DENISE MIRANDA:  Which I'm really afraid

23 of, because I, I just really got pregnant and it took so

24 long for that to happen, you know so --

25          JD:  Right.  Well, congratulations.

8

1    DENISE MIRANDA:  Thank you.

2         JD:  You're welcome, you're welcome.

3    I'm, I'm a proud pappa of a two-year-old.

4         DENISE MIRANDA:  Oh, congratulations to

5    you.

6         JD:  Thank you.  Thank you.

7         DENISE MIRANDA:  Yeah.

8         JD:  Okay.  This is definitely something

9    we can help you out with.  One of our, in fact our main

10   audit attorney, his name is Clyde Miller, you'll be,

11   you'll be glad to know he's never lost a case.  So what

12   happens in an audit is you just need somebody that has

13   the backbone to stand up to the IRS, and that has the

14   ability to back up all of your, all of your claims and

15   all of your deductions to the hilt.  Okay?  The

16   beautiful thing about tax attorneys is, a lot of people

17   think, you know, they, they can file your taxes and this

18   and that, they're, yeah, they're great with tax

19   problems, but they're also great when it comes to audit

20   because they know the, the rule book better than most

21   IRS agents.  What we try to find is where the IRS agent

22   has taken shortcuts and, you know, did not allow things

23   that they should have allowed and everything else.

24        Now, here's my fear.  Okay?  And this is,

25   this is a pretty standard fear whenever you get this far

9

1  is how much information have you given him and is it

2  damaging to your case.

3        DENISE MIRANDA:  We went through the, the

4  most part of it was an interview session --

5        JD:  Uh-huh.

6        DENISE MIRANDA:  -- which lasted a few

7  hours where he asked me about my side business, which is

8  a really small business.  I don't even make any money.

9  I'm a personal trainer, and I do boot camps on the side.

10       JD:  Okay.

11       DENISE MIRANDA:  Yeah, and I, I had

12 claimed my equipment, my apparel and park permits, you

13 know, things I had to buy to put on these boot camps.

14       JD:  All right.

15       DENISE MIRANDA:  And it, I took a loss

16 because I didn't make any money off of them.  I was

17 doing a lot of promotional things, trying to promote my

18 business, trying to get it up off, off of its feet, you

19 know, on to its feet.

20       JD:  All right.

21       DENISE MIRANDA:  And there's also, you

22 know, the, the travel, the cost of travel to get

23 certifications in order to train people and to be out

24 there, you know, giving instruction on exercise.

25       JD:  Right.

10

1          DENISE MIRANDA:  So that was pretty much

2   the whole part of it, and other than that, I, I can't

3   think of anything would would be detrimental to the

4   whole case, that I -- you know.

5          JD:  Okay.  Any time, any time, you know,

6   and we tell all of our clients in any matter, whether it

7   be an audit or just plain old, you know, somebody needs

8   a negotiation, to stop any contact with the IRS.  Now,

9   I'm not telling you to, to avoid meetings with them,

10  just simply because, you know, if you do that, then what

11  they're going to do is they're just going to go and, and

12  make their own assumptions and do what they were

13  planning on doing in the first place.

14          DENISE MIRANDA:  Yeah.

15          JD:  So sounds like you, you've gotten a

16  decent handle on what's going on and that's, that's,

17  that's half the battle for me, because a lot of times I

18  have to spend, you know, 45 minutes to an hour

19  explaining to people the nature of an audit.  You know,

20  most of the people that call me haven't gone to the

21  meetings yet.  They don't understand what they're in

22  for.

23          DENISE MIRANDA:  Yeah.

24          JD:  Oh, no, I can take care of this.  I

25  can do this on my own.  Oh, okay.  Okay.

11

1            DENISE MIRANDA: Yeah, I, I really

2  can't, only because I, you know, I, I didn't want to

3  argue with him because I knew what he was doing, and I

4  was like there's no way you can put this into, you know,

5  say that this, I was making business revenue when this

6  is my personal account. Like I, I didn't understand how

7  I had to claim a gift from my family or like, you know,

8  they were supporting me with my rent, too, because I was

9  out here by myself.

10            JD: Right.

11            DENISE MIRANDA: So depositing money in

12  my account, and he was going to penalize me for that, so

13  it, it didn't seem right.

14            JD: Right. What do you do for a living,

15  your, your real job?

16            DENISE MIRANDA: My real job also health

17  fitness, so I work, I work with health fitness and I, I

18  do, you know, I run at corporate, at corporate sites,

19  like for Mattell and for Toyota, I'm here and I'm taking

20  care of their, you know, their members, their employees,

21  so.

22            JD: Yeah. I see you're calling from a

23  Toyota --

24            DENISE MIRANDA: Yeah.

25            JD: -- looks like a Toyota --

12

1        DENISE MIRANDA:  Yeah, right now.

2        JD:  -- dealership?

3        DENISE MIRANDA:  Right, yeah, correct.

4        JD:  Okay.  Okay.  Well, here's, here's

5  what it boils down to.  Okay?  And this is, this is

6  what's going to make or break the case for you.  Okay?

7  To do an audit, we charge 2,000 a year.

8        DENISE MIRANDA:  Okay.

9        JD:  Okay?  So you're looking at $6,000

10  to take care of the audit, and then the consultation

11  fee, not between you and I, but between us and the

12  IRS --

13        DENISE MIRANDA:  Uh-huh.

14        JD:  -- and all the communication that

15  needs to go forth, because the IRS charges per phone

16  call.

17        DENISE MIRANDA:  Yeah.

18        JD:  Okay?  So you're looking at $6,500

19  for us to take over the case and get all this taken care

20  of.  Now, again, I stress to you that, that Clyde Miller

21  has never lost a case.--

22        DENISE MIRANDA:  Okay.

23        JD:  -- and we don't typically take on

24  cases that we know we're, that we know we can't win.

25        DENISE MIRANDA:  Yeah.

13

```
 1              JD:  So just from where I'm standing, it
 2   sounds like you've done everything on the up and up.
 3   You'd be surprised at some of the losers I have calling
 4   me that have, yeah, well, I've cheated the system and
 5   now they've caught up with me and I need you guys to
 6   defend me.  Well, if you cheated the system, you know, I
 7   paid my taxes, you know, I did what I was supposed to
 8   do, and I'm got going to pay for your mistake, you know,
 9   and I, if it's you've made just a bunch of ridiculous
10   claims on your, your income taxes, I can't protect you.
11              DENISE MIRANDA:  Yeah.
12              JD:  So if that's, you know -- And that
13   doesn't sound like the case here, so that's good.
14              DENISE MIRANDA:  No.  I, I didn't, I know
15   I didn't make any ridiculous claims.  There, I know
16   2007, I did make some mistakes because it was my first
17   time claiming taxes.
18              JD:  Uh-huh.
19              DENISE MIRANDA:  And I didn't know what
20   the hell I was doing and I was using Turbo Tax, which
21   wasn't any help.
22              JD:  Right.
23              DENISE MIRANDA:  And I was trying to
24   reach the deadline and get my taxes done, you know,
25   before the deadline.
```

14

1            JD: Uh-huh, uh-huh, uh-huh.

2          DENISE MIRANDA: And so I know he found

3  some mistakes. Like I claimed I had a renter when I,

4  I'm, I thought it was meant that I was the renter, but

5  the way it was worded was, you know, I didn't

6  understand.

7            JD: Uh-huh.

8          DENISE MIRANDA: So I know that, but

9  other than that, there was no -- I wasn't trying to go

10  around anybody, I wasn't trying to get more money than I

11  was supposed to or make all these weird, ridiculous

12  claims.

13          JD: Okay. Good. If there's some

14  fallout, you know, that's okay. Some fallout is better

15  than, you know, going back and reversing everything.

16  you've claimed for the last three years, because that's,

17  that's where you get in big trouble.

18          DENISE MIRANDA: Yeah, yeah, and I

19  understand that.

20           JD: Right. And it's far easier to

21  defend your, to defend your claims than it is to go back

22  and try to negotiate an amount that comes from, from an

23  audit.

24          DENISE MIRANDA: Uh-huh.

25           JD: Okay? So, and, and this, you know,

setThreshold

15

1  out and dry, plain and simple, the $8,500 to, to take

2  care of you, you know, we, we need, obviously, as, as

3  much of that up front as possible, especially in an

4  audit, especially in an audit case. I mean, you tell me

5  what are you comfortable coming up with, and, and I can

6  get creative with the rest of it.

7          DENISE MIRANDA: I can probably come up

8  with 2,000 right now, at the most.

9          JD: Okay. All right. Let's do this

10  here. Let me do some quick math here.

11          DENISE MIRANDA: Uh-huh.

12          JD: Not my strong suit, believe it or

13  not. I'm great with numbers and a calculator, but when

14  I, when I get them all rattling around in my head, I get

15  lost.

16          DENISE MIRANDA: Yeah.

17          JD: Okay. So if we do 2,000 down, that

18  will leave a balance of 4,500 and you know, obviously I

19  want to get that, you know, as, as quickly as possible

20  because audit appeals, we can get audit -- Usually what

21  we try to do is get involved and get the audit

22  completely thrown out.

23          DENISE MIRANDA: Yeah.

24          JD: Sometimes we can. Sometimes we

25  can't. If we actually physically have to go through the

16

1   audit, that's fine too. Okay? So the sooner, the

2   sooner we get all the funds in, the better. So you --

3   $4,500 split up over two months, is that going to be

4   okay for you?

5             DENISE MIRANDA: Well, what would those

6   payments look like?

7             JD: Oh, let's see, 2,250 a month for the

8   next two months.

9             DENISE MIRANDA: 2,250 a month? Okay.

10            JD: Okay? All right. So let's do that.

11  And that should, that should be ample enough opportunity

12  for us to get involved, because you can only do one year

13  at a time so --

14            DENISE MIRANDA: Yeah. Just, just to be

15  clear, the 2008, I don't know if he -- I know he looked

16  at it so --

17            JD: If he --

18            DENISE MIRANDA: But he didn't. --

19            JD: If he actually --

20            DENISE MIRANDA: He (inaudible) over it.

21            JD: If he asked you questions, any

22  questions at all about 2006, then he's -- Audits always

23  happen in threes. Usually what happens is is they come

24  after you for one year.

25            DENISE MIRANDA: Yeah.

17

1         JD:  Okay?  And then based on the results

2  of that one year, then they go back.  Like say, say he

3  audits you for -- which is, which is what it sounds to

4  me has happened, he's audited you for '07 first.

5        DENISE MIRANDA:  Yes,

6        JD:  Okay.  Now, because he's opened up

7  the floor for '06 and '08, that tells me that he's

8  already got a substantial amount for 2007 that you may

9  not be aware of, but he is, and he knows that if he can

10  get that amount from '06 -- if he knows he can get that

11  amount from '06, he can probably get it from '06 -- or

12  excuse me.  He knows if he can get that amount from '07,

13  there's a good chance he can get it from '08 and '06,

14  plus interest and penalties.

15        DENISE MIRANDA:  Yeah.  I, I don't think

16  he's auditing '06, because I didn't, I didn't work in

17  '08.  There's, I made nothing, not even -- You know, I

18  filed my taxes.  I didn't, didn't make any money.

19        JD:  Okay.  So it's just two years then,

20  '07 --

21        DENISE MIRANDA:  I --

22        JD:  --- and '08?

23        DENISE MIRANDA:  I'm pretty sure it was

24  two years, but he did look at '06, but totally skipped

25  over it.  He, he even said, oh, you don't make enough

18

1   money in '08.

2                JD:  Okay.  Okay.  So then it's just two

3   years.  Well, that's good.  Then it makes it, that will

4   be $4,600, then, and then with 2,000 down, that will

5   leave $2,600.

6               DENISE MIRANDA:  Uh-huh.

7               JD:  And we can split that up if you

8   want, into two months, or we can do one month some

9   payment, and the next month.

10              DENISE MIRANDA:  Okay.

11              JD:  So I mean you tell me what, in your

12   budget, what's come, what's comfortable for you.

13              DENISE MIRANDA:  What if I gave you 1,500

14   now?

15              JD:  Okay.

16              DENISE MIRANDA:  Then what would it look

17   like for my payments?

18              JD:  Okay.  Let's see here.  That would

19   be 3,000, so it would be 1,500 next month and the

20   following month, or it will be 3,000 one one lump sum.

21              DENISE MIRANDA:  One lump sum.

22              JD:  You want to do one lump sum?  Okay.

23              DENISE MIRANDA:  No, I don't want to.

24              JD:  Oh, you don't?

25              DENISE MIRANDA:  Yeah.

19

1       JD:  Okay.

2           DENISE MIRANDA:  Just right now it's kind

3   of -- because I have all my medical stuff that I'm going

4   through, too, that I'm paying as well, so I want to -- I

5   mean I could pay it.  I just need, like I need it to be

6   spread up, spread up, because I don't know what --

7           JD:  Okay.

8           DENISE MIRANDA:  -- I --

9           JD:  That's fine.  I can do, I can do

10  1,500 down and then we'll do 1,500 next month and then

11  1,500 the month after that.

12          DENISE MIRANDA:  Okay.

13          JD:  Okay?  Because what we're going to

14  do is we're going to tie, we're going to tie it up in

15  litigation as long as we can.

16          DENISE MIRANDA:  Uh-huh.

17          JD:  Okay.  And basically all we do is we

18  use their own rules and laws against them and make them

19  wait, and put them on the spot, make them, you know, let

20  them squirm a little bit, and kind of turn the table on

21  them.  That gives us enough opportunity to buy some time

22  to get ready for any appeals that need to happen.  So,

23  so you're looking at -- Let's see.  Let me start at,

24  yeah, 4,500, and then split up over the course of the

25  next three months with 1,500 down, or two months, three

20

1   months counting this month, so let's go ahead and get

2   that started. Let me get some information from you.

3                DENISE MIRANDA: Okay. How do I know

4   this is legit, first, because I don't want to get, I

5   don't want to get, you know.

6                JD: Oh, I understand, I understand.

7   Well, first, first of all, you know, we've, we're, we've

8   been in business for a very long time. This is a

9   question we get sometimes. And we're endorsed by Bill

10  O'Reilly and a lot of the big guys on, on Fox News

11  Network and, and everyone else. You know, we've, just,

12  you know, when you picked up the phone today and you

13  called, you found us, so it's, you'll find us again

14  tomorrow and the day after that. We're not going

15  anywhere. We're not hiding. We advertise pretty

16  heavily. We spend lots of money on advertising every

17  month, you know, to, to put our name out there, so,

18  Have you ever heard of, you, you know who Bill O'Reilly

19  is?

20                DENISE MIRANDA: I'm familiar with Bill

21  O'Reilly.

22                JD: You know who Dennis Miller is?

23                DENISE MIRANDA: Dennis Miller?

24                JD: Uh-huh.

25                DENISE MIRANDA: No.

21

1          JD:  He, he is, he does some similar to
2  Bill O'Reilly.  He's on, he's on Fox News, and he also
3  does, he has a big radio talk show.  He was a football
4  announcer for a long time, and then it didn't work out
5  for him.

6          DENISE MIRANDA:  Uh-huh.  Yeah.  It
7  sounds familiar, but I'm not too sure.

8          JD:  He also endorses us, personally
9  endorses us.  So that was a, that was a really huge, a
10  monumental thing for our company is to, is to get
11  endorsed by those guys because you know, they're big
12  names in the political world, and they do a lot of help
13  for, they do, they help out a lot of folks so.

14          DENISE MIRANDA:  Uh-huh.

15          JD:  But other than that, I mean, you
16  know, we've been in business, like I said, been in
17  business for a long time so.

18          DENISE MIRANDA:  Okay.  And how, I don't
19  know, I just, I kind of feel like I, I need a -- I don't
20  know.  It's just like a lot of money to give out when
21  I'm not too sure on the first phone call.

22          JD:  Uh-huh.

23          DENISE MIRANDA:  But I do definitely, I
24  know I definitely need help with this.  This is a lot to
25  take on on my own.

Sunbelt Reporting & Litigation Services
Houston   Austin   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio   Bryan/College Station

22

1    JD: Yeah. And, and rightfully,

2  rightfully, you know, you should -- you, you are

3  obviously, an understanding of the severity of the

4  situation, the gravity of what's going on, so -- And in

5  an audit, you know, time is never on your side, so I

6  mean, we're -- You've already, you've already had one

7  appointment with the, with the auditor and -- What is,

8  what was the -- You said you went yesterday was the day

9  of the audit?

10    DENISE MIRANDA: Yes.

11    JD: Okay. So you --

12    DENISE MIRANDA: All right. Yeah. He

13  wants the, ho said at least one more appointment

14  for '07, and then he wants to go through '08 as well.

15    JD: Okay. Okay. Did he set up a time,

16  a timetable with you?

17    DENISE MIRANDA: Yeah. It's July 1st is

18  the next one.

19    JD: Okay;

20    DENISE MIRANDA: But he --

21    JD: 1st of July.

22    DENISE MIRANDA: You know, it's just hard

23  because I have to go -- He made me buy bank statements

24  for three years and that's $5 a bank statement.

25    JD: Yeah.

23

1          DENISE MIRANDA: So I've already put a

2    lot of money into it, like, you know, according to my

3    budget, because I don't, you know, I don't have that

4    much money.

5          JD:  The next one is for 2007?

6          DENISE MIRANDA:  They both are.   The

7    first one was, and then this will be a followup for

8    2007.

9          JD:  Okay.  And then the one after that,

10   did he set a date for the one after that?

11         DENISE MIRANDA:   No.

12         JD:  Okay.  He will next time.  2007, and

13   then for 2000 -- You'll probably have the same situation

14   with 2008 as well.  They'll want to, they'll want to

15   meet with you twice for 2008, so that will probably be,

16   I'd say mid, mid to late July.

17         DENISE MIRANDA:  Okay.

18         JD:  And then he'll have another one for

19   2008 to wrap, to wrap it up.  Okay.  Let's see here.

20   All right.  So I'm; you tell me what do you want to do

21   next.

22         DENISE MIRANDA:  Can I just hear like

23   some of the benefits, how this is going to help me?  You

24   know, it's just --

25         JD:  Absolutely.  I mean absolutely.

24

1   What's -- And, you know, just to kind of reiterate
2   what's going to happen here is when we get involved, the
3   first thing we do, obviously, is contact the IRS and you
4   know, we give them legal documents, power of attorneys,
5   let them know we're your representation, because, you
6   know, you should never, you should never go into an
7   audit alone and by yourself, and I think you've, you've
8   gotten a firm understanding of why that is now.  Then we
9   pull your master file and find out exactly, you know,
10  get the, get the reasoning behind the audit, because
11  there's, there's always a reason.  They don't just audit
12  you for, for no apparent reason.  They, they have.
13  ulterior motives.

             DENISE MIRANDA:  Yeah.

14
15           JD:  Okay?  So we find out, you know,
16  what's going on.  We're going to try to locate ourselves
17  the, what they can be consider to be fishy and, and you
18  know, identify ahead of time what we're working against.
19  Then we start building a case, while we are putting
20  them, you know, while we're stalling them with, you
21  know, tying them up in litigations and everything else
22  and buying as much time as possible.  You know, we want
23  to try to stretch this out as long as we can, because
24  what's, what happens here is the auditor is going to get
25  tired of waiting, and he's just going to, he'll either

25

1  drop the case and say forget about it and move on to the
2  next person or, you know, he'll go ahead and try to
3  follow through with it, in which case, you know, we're,
4  we're more than welcome to invite that, bring it on, in
5  other words. You know, we, by the time, by the time
6  they get done with all the litigation, we'll be ready
7  for the case and we'll have all the proof and
8  documentation that we need, and it's at that point we
9  pretty much just lay it down on the table and say
10 listen, this is what it is, you know, you can scream and
11 moan all you want to about this and that, but we have,
12 right here in black and white, and according to tax
13 article four, section six, you know, this is what's
14 going on, this is the right stuff that we need. We,
15 it's just a matter of knowing the laws and knowing what
16 your rights are, and we do.
17         Like I told you earlier, Clyde Miller has
18 never lost a case. We actually do more audits in one
19 month than most firms do in a year and most tax
20 attorneys do in a lifetime, so audits are one of our
21 main things.
22         DENISE MIRANDA:  Okay.
23         JD:  So rest, rest assured, we're, we're
24 very, we're very good at what we do and we're proud of
25 that.

26

1         DENISE MIRANDA:  Do you -- I mean in the

2  long run, you think I'd be saving money rather than, you

3  know, paying out all this money to the IRS?

4         JD:  Yeah, because here's -- It's like I

5  said before.  Here's what happens in an audit.  Okay?

6  Before they even decide to audit you, they've already

7  identified something in your return that is going to get

8  them a sizable amount of money back.  Okay?.  What,

9  what's, what has really spawned all this and let's,

10  let's kind of take the long, the long leap around to

11  kind of get back to where we're at is, you know, with

12  all the corporate bailouts and everything that's been

13  going on, you know, with buying, you know, bailing out

14  the big three, you know, Ford, Chevy and, and Chrysler

15  and --

16         DENISE MIRANDA:  Yeah.

17         JD:  -- you know, all the, the financial

18  institutions that need bailing out, you know, they've,

19  they're shelled out, you know, close to a trillion

20  dollars now in, in bailout money.  And what they didn't

21  tell you was, yeah, what they -- They gave you the, the,

22  you know, the warm fussy, you know, yeah, we're going to

23  do this, this is going to save them, this is going to,

24  you know, what this is going to do for America is great,

25  blah, blah, blah, blah, blah.  What they didn't tell you

27.

1 | was, by the way, taxpayer, you're responsible, you know,

2 | for the amount of money that -- you're, you're

3 | responsible, you're going to wind up being responsible

4 | for, you know, whatever the outcome is, you know,

5 | whatever you wind up owing the IRS, so what, you know,

6 | whatever.  So they've increased their collection

7 | activity to, you know, pursue tax evaders, and they've

8 | been looking a little bit harder at folks' tax returns.

9 | And they, what they've done is they've identified

10 | somewhere in your return where they can make money, and

11 | they can get some money back to pay for the deficit,

12 | because it's fallen on the taxpayer.  Just in the last

13 | two months alone, Obama has beefed up the, the

14 | collection efforts and the collection team for the IRS

15 | by hiring, you know, 8,000 new revenue agents and

16 | collection agents and everything else.  You know, first,

17 | their, their first strike is, you know, on small

18 | companies and corporate organizations.  Then, then it's

19 | going to trickle down into, you know, private tax

20 | returns and everything else like that, which is, which

21 | is where you're at right now, and unfortunately, you

22 | know, once, once they get involved, there's not a whole

23 | lot that we're going to be able -- you know, all we're

24 | going to be able to do is be able to help people deal

25 | with the fallout and, you know, try to help represent

28

1  people as much as possible, because these next couple of

2  years are going to be pretty shaky when it comes to tax

3  returns. So --

4         DENISE MIRANDA:  Okay.

5         JD:  -- just for future reference, make

6  sure you're being careful when you do all your tax

7  returns, because --

8         DENISE MIRANDA:  Yeah.

9         JD:  -- they're really starting to look

10 hard at folks, really --

11        DENISE MIRANDA:  Yeah, because I just --

12        JD:  -- starting to look hard at folks.

13        DENISE MIRANDA:  I just started mine for

14 myself, because not a lot of -- You know, when I went to

15 people to do my taxes, they didn't know about my

16 business that I do, so they didn't know -- You know, I

17 was -- they didn't how to file it, but --

18        JD:  Uh-huh.

19        DENISE MIRANDA:  -- I've done it my own.

20 But there's other parts besides just the Schedule C that

21 I didn't know.  I, I may or may not, I don't think I've

22 messed up on that one that much, but.

23        JD:  Well, what you need to do is, what

24 you need to do, too, in the future is you need to find

25 yourself a good little local CPA firm to take care of

29

1 your taxes for you.  And something else, too, is, you

2 know, even if you're a sole proprietor, you should think

3 about, you know, incorporating your business.  You know,

4 it gets you more, more tax leverage.  You know, you --

5               DENISE MIRANDA:  Yeah.

6               JD:  -- get a little bit, you get tax

7 breaks and everything else, and plus it's, if you do

8 like a limited liability, then it lowers your liability

9 for, you know, if something were to happen to the

10 company or, you know, for instance something like this

11 were to happen.  Now, the only difference is is if you

12 were to incorporate your business and you were to bring

13 on, you know, employees, instead of just being a sole

14 proprietor, then instead of paying them, you know, cash

15 and 1099ing them, which I'm not sure if you know what

16 that means, but --

17               DENISE MIRANDA:  Yeah, I know.

18               JD:  Okay.  Instead of 1099, you would W

19 -- you would give them a W-2 and actually have

20 withholdings and you'd pay quarterly taxes, but the

21 amount of taxes that you'd pay out for your business is

22 minimal compared to what you're paying right now.

23               DENISE MIRANDA:  Yeah.

24               JD:  So that's just something to think

25 about in the future too.  But that, you should

30

1  definitely, you know, for the, for the future and for

2  2009 you should find, you know, somebody local that's,

3  you know, not too -- because there's some, there's some

4  CPAs out there that will rip your head off.  You know,

5  they're, they're big corporate CPAs, and they're used to

6  dealing with bigger agencies, and quite honestly, their

7  time is extremely expensive.

8               DENISE MIRANDA:  Yeah.

9               JD:  So you just find somebody that's

10  local, that's not necessarily small time, but you don't

11  want to them to be big time either, to help prepare your

12  taxes for you.  That way you don't find yourself in

13  this --

14               DENISE MIRANDA:  Okay.

15               JD:  -- position later.

16               DENISE MIRANDA:  Okay.

17               JD:  Okay?

18               DENISE MIRANDA:  All right.  Okay.  So

19  going through this, do I have to do anything more?  Like

20  do I have to contact the IRS and send them --

21               JD:  Not at --

22               DENISE MIRANDA:  -- any more?

23               JD:  Not at all, not at all.  We, we want

24  to, we want you to have as little contact with the IRS

25  as possible.  In fact, from now on, when they contact

31

1  you, all you have to tell them is I've hired Taxmasters

2  as my representation, my audit appeal. If you have any

3  questions, please call them. You hang up the phone and

4  close the door. That's it.

5                    DENISE MIRANDA:  Okay.

6                    JD:  You don't have to say anything else.

7  Your part in the process, all we'll need from you, when

8  we go into your audit, there's going to, any time

9  there's an audit, we're going to have lots of questions

10  for you.

11                    DENISE MIRANDA:  Yeah.

12                    JD:  We're going to kind of give you a

13  mini audit so that we can figure out what needs to

14  happen.

15                    DENISE MIRANDA:  Okay.

16                    JD:  You know, just, just some, not

17  necessarily generic questions. Our questions are going

18  to be more specific, because they're obviously prudent

19  to your case.

20                    DENISE MIRANDA:  Yes.

21                    JD:  And then if there's any receipts or

22  anything that we're going to need to, you know, validate

23  any of your deductions or any of your claims, then, you

24  know, we'll have you generate those for us. You can

25  either, you know, fax them, e-mail them, mail, you know,

32

1   whatever, hand deliver them, doesn't matter.

2                   DENISE MIRANDA:   Okay.

3                   JD:  Okay?  So that we can get this taken

4   care of for you.

5                   DENISE MIRANDA:  All right.

6                   JD:  All right?  So we, we try to, we try

7   to have as little -- What's a, a what's a good way to

8   explain this?  We try to have as, as little

9   responsibility on our clients' hands as possible.  You

10  guys are busy with your own businesses and your own

11  lives.  This is what we do for a living.  So, you know,

12  why not take all the responsibility off your shoulders?

13  Our ultimate goal in the process is to, you know,

14  relieve you of the burden, put it on our shoulders, get

15  everything solved for you so that, you know, everything

16  is back to normal.

17                  DENISE MIRANDA:  Okay.

18                  JD:  This is a pretty chaotic time, you

19  know --

20                  DENISE MIRANDA:  Yeah.  It's, you know --

21                  JD:  (Inaudible)

22                  DENISE MIRANDA:  It was so much, and I,

23  you know, I couldn't even make that -- Those three years

24  combined, I probably made like a total of 3,000, you

25  know.  It's like --

33

1                    JD:  Uh-huh.

2                    DENISE MIRANDA:  -- you know, why are you

3  guys picking on me?

4                    JD:  Right.

5                    DENISE MIRANDA:  So, but and then, and

6  then to hear that they can take all of my savings, my

7  life savings, you know, it's kind of --

8                    JD:  Absolutely.  See, what they're doing

9  there is, is it's scare tactics.

10                   DENISE MIRANDA:  Yeah.

11                   JD:  They, they, they do have the power

12  to take a lot of stuff from you.  You know, they can

13  take up to 90 percent of your income.  They can take,

14  you know, bank accounts, you know, 401Ks, IRAs CDs, any

15  kind of investments that you have that's liquid, they

16  can, they can get their hands on it and take it, and

17  with very little to no warning at all.  So obviously,

18  they don't want to tell you, we're going to take $10,000

19  from you next month out of your account.  They're not

20. going to give you a heads up.  Usually what happens is

21  is they send you letters in the mail, the notice of

22  intent to levy, and then about three or four days later

23  you get a notice from your bank the IRS has seized your

24  funds.

25                   DENISE MIRANDA:  Okay.

34

1       JD:  So they usually always happen on the

2   same day, so you don't get an opportunity to counteract.

3   It's just from this point on, you're reactive instead of

4   being proactive.

5       DENISE MIRANDA:  Yeah.

6       JD:  So and that's what's important is

7   keeping the -- keeping control, keeping the ball in your

8   court, and keeping everything on your terms, and that's

9   what we, that's what we bring to the table, and that's

10  what we enforce is to make sure everything stays in your

11  power, in your hands.

12      DENISE MIRANDA:  Okay.

13      JD:  Okay?

14      DENISE MIRANDA:  All right.

15      JD:  All right.  So let's, let's talk a

16  little bit about the funds.  You said you wanted to do

17  $1,500 down, and then we can split up the rest of it

18  over the course of the next two months.  Okay.  I didn't

19  catch your last name, though.

20      DENISE MIRANDA:  It's Miranda,

21  M-I-R-A-N-D-A.

22      JD:  Okay.  All right.  And you got a

23  mailing address?

24      DENISE MIRANDA:  I do.  It's ████

25      JD:  Okay.

35

1    DENISE MIRANDA:   And that's on ███████

2    ███████████████

3        JD:   Okay.   And what's --

4        DENISE MIRANDA: ████████████████████

5    yeah, ████████

6        JD:   Okay.

7        DENISE MIRANDA:   And ████████████████████

8        JD: ██████████████

9        DENISE MIRANDA:   And that's Long Beach,

10   California.

11       JD:   Oooh, LBC.

12       DENISE MIRANDA:   Yup.

13       JD:   All right.

14       DENISE MIRANDA:   And the zip code there

15   is 90803.

16       JD:   All right.   Let's see here.   Okay.

17   Let's see here.

18       DENISE MIRANDA:   So then all the bank

19   statements that I just ordered, do I even need to do

20   that still?

21       JD:   Yeah.   Yeah, because there's a good

22   chance we're probably going to need it too.

23       DENISE MIRANDA:   Okay.

24       JD:   So absolutely, yeah, go ahead and

25   follow through with that.

36

1    DENISE MIRANDA:  Okay.

2    JD:  You know, information, at this.

3  point, is, is knowledge -- you know, knowledge is power.

4    DENISE MIRANDA:  Got it.

5    JD:  So, you know, anything we can have

6  and use, the better.

7    DENISE MIRANDA:  Okay.

8    JD:  Let's see here.  Now, let's do this.

9  I'm filling in some of these fields.  What's your date

10  of birth?

11    DENISE MIRANDA: ████████████

12    JD:  Okay.  Is your, is your husband

13  involved in any of this at all?  Is his name on any of

14  this or is this just solely on you?

15    DENISE MIRANDA:  It's solely on me.

16    JD:  Okay.  Okay.  Well, that's, that's

17  good.  That's good.

18    DENISE MIRANDA:  Yeah.  He's only my --

19  We haven't gotten married yet, so --

20    JD:  Oh, okay.  Okay.  Cool.  You-all

21  have a debt -- You-all have a date set?

22    DENISE MIRANDA:  It was supposed to be

23  this year in July, but with everything going on.

24    JD:  Yeah.  Actually, believe it or not,

25  my, my fiance and I, we're tying the knot in two weeks,

37

1  so we're --

2          DENISE MIRANDA:  Oh --

3          JD:  -- pretty excited about it.

4          DENISE MIRANDA:  -- congratulations.

5  That's great news.

6          JD:  Yeah, yeah, June 28th, so we're,

7  we're extremely pumped.

8          DENISE MIRANDA:  Perfect month, perfect

9  date right there.

10         JD:  Oh, yeah.

11         DENISE MIRANDA:  Picked a good one.

12         JD:  Yeah.  And youb know, it's, it's

13  been great because we've, we've been planning this; you

14  know, for years, it seems like, you know.

15         DENISE MIRANDA:  Yeah.

16         JD:  And we set one date and then that

17  date, you know, it was getting --

18         DENISE MIRANDA:  That's --

19         JD:  -- closer to that date and we just

20  weren't ready --

21         DENISE MIRANDA:  Yeah.

22         JD:  -- and then we set it again, and

23  then we just weren't ready.  So now it's, you know,

24  everything's planned.  All we got to do is show up.

25         DENISE MIRANDA:  Yeah.  Yeah, that's, I

38

1  think that's what's going on with us.  So hopefully, you

2  know, once we get everything out of the way and cleared

3  up, we, you know, just have a perfect wedding, no, no

4  hassle, no worries, no stress.

5          JD:  Absolutely.  Well, at least until

6  you start planning.  I, my, my, my fiance has been

7  running around like a chicken with her head cut off --

8          DENISE MIRANDA:  Yeah.

9          JD:  -- about six months now, getting

10  everything planned, and you know, she's, she's got this

11  image in her mind of what she wants it all to be like,

12  and where she wants and what she wants to wear.  You

13  know, she's been planning her wedding since she was four

14  so.

15          DENISE MIRANDA:  Yeah, see, that's the

16  opposite of me.  I'm making my fiance do everything

17  because I, I just don't want to deal with it.

18          JD:  Yeah, exactly.

19          DENISE MIRANDA:  Yeah.

20          JD:  Exactly.  All right.  Let me get

21  your social, so I make sure we get the right taxpayer.

22          DENISE MIRANDA:  Sure.  It's ████

23          JD: ████

24          DENISE MIRANDA: ████

25          JD: ████

39

1          DENISE MIRANDA: ████

2          JD: ████

3          DENISE MIRANDA: ████

4          JD: ████ Okay. All righty. How did you

5 want to take care of the 15? Did you want to do credit

6 card, debit cards --

7          DENISE MIRANDA: Um.

8          JD: (Inaudible).

9          DENISE MIRANDA: Yeah. My credit, my

10 Mastercard.

11          JD: Okay. That's fine.

12          DENISE MIRANDA: Okay.

13          JD: All right. Go ahead.

14          DENISE MIRANDA: It's ████

15          JD: ████

16          DENISE MIRANDA: ████

17          JD: ████

18          DENISE MIRANDA: ████

19          JD: ████

20          DENISE MIRANDA: ████

21          JD: Okay. And expiration date? ████

22          DENISE MIRANDA: ████

23          JD: Okay. Should be a three digit code

24 oh the back of the card.

25          DENISE MIRANDA: Yeah, ████

40

1          JD: ████   All right. Is the billing

2  address the same as your home address?

3            DENISE MIRANDA: Correct.

4          JD: Okay. Just a second here.

5         DENISE MIRANDA: And is there any way I

6  can have like a, a receipt?

7          JD: Absolutely.

8         DENISE MIRANDA: Give the details?

9          JD: Absolutely.

10         DENISE MIRANDA: Okay.

11         JD: Absolutely. Actually, believe it or

12  not, in about 45 minutes to an hour you're going to

13  have, oopsy, you're going to have all of this. There's

14  quite a bit of stuff I'm actually going to be sending

15  you.

16         DENISE MIRANDA: Okay.

17         JD: So let's see here. One of, there's

18  one of the things I'm going to be sending you is the

19  engagement agreement, which is basically what we've

20  talked about, the services that we're going to do for

21  you.

22         DENISE MIRANDA: Okay.

23         JD: And then the other is going to be

24  two of the -- Why does it keep doing that? Ah, shoot.

25  Okay. Hang on just a second. My computer is acting

41

1  goofy on me here.

2          DENISE MIRANDA:   Okay.

3          JD:   Okay.   There we go.   The two power

4  of attorneys that we're going to be sending you, which

5  it gives us the right to represent you, and the other

6  one is the gain -- let's us gain access to your, your

7  master file.   And then what comes after that is a, an

8  engagement agreement guide, which is kind of a list of

9  things to, to, you know, expect and, you know, it will

10 answer a lot of, you know, questions that you guys may

11 have, you know, in the next couple months.   What do I

12 need to do now?   What's next?   You know, it also

13 includes some information that we may need from you

14 guys, so it will, it will help you be prepared for the

15 future, too, and it gives you some good pointers,

16 especially if you're a business owner too, so.

17         DENISE MIRANDA:   Okay.

18         JD:   All right.   What I'm going to do now

19 is I'm going to get you on the line with my assistant.

20 My spelling is, is worse than my math, so I want to make

21 sure that I spelled everything right, and then she's

22 also going to talk to you a little bit more about the

23 two forms I'm going to be sending you, and she's also

24 going to tell you what your rights are.   So listen up.

25 This is important info, you know, basically kind of

42

1   stuff like if the IRS contacts you, just tell them
2   you're with us, you don't need to talk to them anymore,
3   you know, you can put them at bay. So let me get her on
4   the line real quick. Too, one, one question before I
5   do. What is your e-mail address, so I can send all that
6   info to you?

7              DENISE MIRANDA: Okay. It's ███████████
8   that's ███████████

9              JD: Uh-huh.

10             DENISE MIRANDA: ████████████████████

11             JD: Okay.

12             DENISE MIRANDA: And then ███████████████
13  and that's at ███████████

14             JD: ███████████████████████████

15             DENISE MIRANDA: ██████████████████████
16  ████

17             JD: Oh, that's what I meant, ████████████

18  ████████████

19             DENISE MIRANDA: Yeah. So the ███ takes
20  the place of the ███

21             JD: All right. Cool. All right.

22             DENISE MIRANDA: That's at ████████████

23             JD: All right. Fantastic. All right.
24  Give me just a couple seconds. I want to get her on the
25  line. Okay?

43

1            DENISE MIRANDA:  Okay.

2            JD:  Okay.  Just a second.  Let me track

3  her down.

4            DENISE MIRANDA:  Can I have your name

5  again?

6            JD:  Yeah.  It's JD.

7            DENISE MIRANDA:  JD, thank you for all

8  your help.

9            JD:  Hey --

10           DENISE MIRANDA:  Really appreciate it.

11           JD:  Not a problem.  That's what I'm here

12  for.

13           DENISE MIRANDA:  All right.  Thank you.

14           JD:  All right.  Miranda, are you

15  there --

16           DENISE MIRANDA:  Yeah.

17           JD:  -- or Ms. Miranda?

18           DENISE MIRANDA:  Yeah, yeah.

19           JD:  All right.  You're in luck.

20  Actually, the -- I actually tracked down my supervisor,

21  so he's going to be taking care of it from here, and if

22  you have any questions, just feel free to shoot away.

23  I'm going to stay on the line, and, and he'll be able to

24  answer all your questions too.

25           DENISE MIRANDA:  Okay, perfect.

44

1.   KEITH:  Hi, Denise. This is Keith. I

2 will be doing the third party verification. I've got

3 the spelling of your name as D-E-N-I-S-E, last name

4 M-I-R-A-N-D-A. Is that correct?

5          DENISE MIRANDA:  Correct.

6          KEITH:  That your contact number is a

7 mobile phone.

8          DENISE MIRANDA:  Yes,

9          KEITH: █████████████████

10          DENISE MIRANDA:  Actually incorrect.

11          KEITH:  Okay.

12          DENISE MIRANDA:  Contact, my mobile phone

13 is area code ██████████████████

14          KEITH: ████████████

15          DENISE MIRANDA:  Correct.

16          KEITH:  Got you. And the other,

17 ████████████████

18          DENISE MIRANDA:  Correct.

19          KEITH:  And what was the other number?

20          DENISE MIRANDA:  I have another home

21 line. It's ██████████████

22          KEITH:  Okay. And we have a, a mailing

23 address of ████████████████████████

24 ████ Long Beach, California, 90803.

25          DENISE MIRANDA:  Correct.

45

1                KEITH:   I like Long Beach.   I've been out

2  there before a few times.

3                DENISE MIRANDA:   Yeah, it's nice.

4                KEITH:   And we've got your date of birth

5  as ██████████████

6                DENISE MIRANDA:   Yes.

7                KEITH:   And your social security number

8  is ████████████

9                DENISE MIRANDA:   Yes.

10              KEITH:   Okay.   And then total fees for

11  the service is going to be $4,500 for an audit appeal,

12  an audit defense, and we're going to be putting $1,500

13  down today on a Mastercard.

14              DENISE MIRANDA:   Yeah.

15              KEITH:   It's going to leave a balance of

16  $3,000, and we're going to do $1,500 same time next

17  month and then $1,500, the remaining balance, a month

18  later on August the 18th.

19              DENISE MIRANDA:   Is there any way to

20  split that up, or even more, like add one more month, or

21  does it have to be in three months?

22              KEITH:   It's, it's best if it is, but if

23  you need three months and you're telling me that up

24  front, then we'll go ahead and do that real quick.

25             DENISE MIRANDA:   Yeah.   If -- I can pay

46

1   it, but if I can split it up one more month, that would

2   work --

3           KEITH: Okay.

4           DENISE MIRANDA: --- a little better. So

5   I can still put the 1,500 down today, but if I can add

6   one more month to the rest.

7           KEITH: Sure, absolutely.

8           DENISE MIRANDA: Okay.

9           KEITH: So we could do $1,000 on July the

10   18th, thousand dollars on August 18th, and $1,000 on

11   September 18th.

12           DENISE MIRANDA: Yes.

13           KEITH: Okay. And then the credit card

14   we're going to be using is a           It's

15  

16           DENISE MIRANDA: Uh-huh.

17           KEITH: And that's in your name, Denise?

18           DENISE MIRANDA: That's Denise, yeah.

19           KEITH: And the expiration date is, is

20   December -- is

21           DENISE MIRANDA: Yes.

22           KEITH: And on the back of the card, the

23   last three digits are

24           DENISE MIRANDA: Yes.

25           KEITH: Now, is the billing address on

47

1  that credit card the same as your home mailing address?

2              DENISE MIRANDA:  Yes.

3              KEITH:  Okay.

4              DENISE MIRANDA:  I think you got the last

5  four numbers wrong.  It's ████  You said, I think you

6  said ████

7              KEITH:  Oh, I might have said the wrong

8  number.

9              DENISE MIRANDA:  Oh.

10             KEITH:  But it, it is typed ████

11 Thanks --

12             DENISE MIRANDA:  Oh.

13             KEITH:  -- for catching that.

14             DENISE MIRANDA:  Okay.

15             KEITH:  I don't normally do this.  My,

16 our assistant does.

17             DENISE MIRANDA:  Yeah.

18             KEITH:  She might have stepped away for a

19 minute or two.  And e-mail, we have your first name

20 ████  it looks like no ████ it's just ████

21             DENISE MIRANDA:  Right.

22             KEITH:  Is that a typo?

23             DENISE MIRANDA:  No.  That's correct.

24             KEITH:  The, at ████  Okay.

25             DENISE MIRANDA:  Yeah.

1        KEITH: And it's, that's interesting.

2 Okay. I wanted to congratulate you. You've taken an

3 important first step in resolving the tax problem,

4 Miranda, Denise.

5        DENISE MIRANDA: Denise.

6        KEITH: The good news is that your

7 initial payment today authorizes us to immediately begin

8 working on your case. Isn't that great news?

9        DENISE MIRANDA: That's perfect news.

10        KEITH: Okay. Now, do you have any

11 questions about the services you purchased today?

12        DENISE MIRANDA: I just, I just want to

13 make sure everything is legit and I'm not just throwing

14 my money on someone who, you know, I don't know.

15        KEITH: I understand.

16        DENISE MIRANDA: I'm still nervous, you

17 know, about the whole situation, because I mean this

18 whole tax audit came out of the blue and just kind of,

19 you know, it took me by surprise and, you know, I've

20 never tried to deal with anything like this before.

21        KEITH: Yeah. It's, it's important that

22 you get great representation on this. Our, our audit

23 defense team is just phenomenal. Mr. Clyde Miller and

24 his team, we've, we've been fighting the IRS for about

25 20 years now. He's won every single case he's ever

49

```
 1  done. Here at Taxmasters we do about 25 cases every
 2  month, which is most -- which is more than most firms do
 3  in an entire lifetime, so --
 4            DENISE MIRANDA:  Yeah, that's what JD was
 5  telling me.
 6            KEITH:  Yeah.  We're phenomenal at it.
 7  It's our strongest, strongest --
 8            DENISE MIRANDA:  I'm really worried.  I,
 9  I don't -- I told JD, it's kind of personal, but I --
10  it's taken me so long to get pregnant, I, you know, I
11  finally am now, and I'm very high risk, and I'm trying
12  my best not to stress out, so I just want to make sure
13  everything is going to be smooth for me, and I, I don't
14  want to lose the baby, you know.
15            KEITH:  Oh, congratulations.  Yeah,
16  that's right.
17            DENISE MIRANDA:  (Inaudible).
18            KEITH:  That's awesome.  I have three
19  children myself.  Yeah, it's --
20            DENISE MIRANDA:  Yeah.
21            KEITH:  Yeah.  It's something that's
22  important to know that, that you can get through to us
23  any time you need us, and contact JD or myself, and we
24  have a direct line to our customer service, as well.  We
25  also call outbound every month or so, and, and in audit
```

50

1   cases it's a little more often, so I hope you don't

2   think we're too pesty, but --

3           DENISE MIRANDA:  Oh, no;

4           KEITH:  -- we like to make sure that

5   you're up to date on everything.

6           DENISE MIRANDA:  Okay.  Perfect..

7           KEITH:  And so any idea if it's a boy or

8   girl yet?

9           DENISE MIRANDA:  It's a boy.

10          KEITH:  Oh.

11          DENISE MIRANDA:  Yeah, yeah, it's a

12  little boy.  He's throwing it all out and everything,

13  so,

14          KEITH:  Oh, wow, fantastic.  Do you have

15  a due date yet?

16          DENISE MIRANDA:  Halloween.

17          KEITH:  Halloween.

18          DENISE MIRANDA:  Halloween, yeah.

19          KEITH:  That's fantastic.

20          DENISE MIRANDA:  Yeah.,

21          KEITH:  Wow.

22          DENISE MIRANDA:  Yeah.  So the doctor --

23  because I've already broken out in hives, I've had

24  already two -- about three or four panic attacks, so

25  they're about to put me on disability, and then the tax

51

1  audit came and I was like, oh, gosh, I, I don't know if

2  I can do it, so, you know, I'm just, I, I think this is

3  the best bet for me --

4          KEITH:  Yes --

5          DENISE MIRANDA:  -- help me out.

6          KEITH:  -- it is, absolutely.

7          DENISE MIRANDA:  Because IRS doesn't care

8  what I'm going through right now.

9          KEITH:  No.  You could be on a terminal

10  death bed and they wouldn't care, unfortunately.

11          DENISE MIRANDA:  Yeah, yeah.

12          KEITH:  They just -- yeah, they're pretty

13  bad.

14          DENISE MIRANDA:  Yeah.

15          KEITH:  Well, I want to read this real

16  quickly to you here.  Wanted to welcome you aboard

17  again, Denise, and you'll be -- You may continue to

18  receive letters from the IRS.  Now, two of the documents

19  we need you to sign are official notices to the IRS that

20  we represent you, so please sign and return those

21  immediately.  Okay?

22          DENISE MIRANDA:  Okay.

23          KEITH:  And now the IRS is not supposed

24  to contact you by phone or by person, they're not

25  supposed to visit you at work or at home after they

52

1   receive these notices.  However, some rogue IRS
2   representatives may choose to ignore the law and contact
3   you anyway.  This is unethical, but it does happen.  So
4   please make sure you instruct the IRS representative to
5   contact Taxmasters immediately.  Terminate all
6   discussions.  Don't talk to them.  After you tell them
7   that you've retained Taxmasters to represent you, you
8   can hang up the phone or you can close the door.  Okay?
9            DENISE MIRANDA:  Okay.
10           KEITH:  Now, make sure you sends any IRS
11   notices you receive, in case the IRS forgets to send us
12   a copy.  This information might be vital in carrying out
13   the services you've purchased.  Okay?
14           DENISE MIRANDA:  Okay.
15           KEITH:  Now, do you have any other
16   questions for me now about your engagement agreement
17   with Taxmasters or anything about the services you
18   purchased today?
19           DENISE MIRANDA:  No, no.  I think I'm
20   good.
21           KEITH:  Okay.  Well, we'll be getting
22   these documentations drawn up for you in our department,
23   legal department, and get them out to you via e-mail.
24   Okay?
25           DENISE MIRANDA:  Okay.  Is there anything

53

1 | more that I need to do on my end?

2 |        KEITH:  No.  Just get the documents

3 | signed and get them back to us as soon as you can.

4 |        DENISE MIRANDA:  I sure will.  Okay.

5 |        KEITH:  All right.  Well, let me get you

6 | back in contact with JD.

7 |        DENISE MIRANDA:  Okay.

8 |        KEITH:  Here he is.

9 |        DENISE MIRANDA:  Thank you, Keith.

10 |        KEITH:  You're welcome.

11 |        JD:  Denise, you there?

12 |        DENISE MIRANDA:  Yes, I am.

13 |        JD:  Okay.  What needs to happen now, I'm

14 | just going to get all these documents drawn up.  It's

15 | going to take me about 30 or 45 minutes.  You should

16 | have them all to your e-mail within an hour.

17 |        DENISE MIRANDA:  Uh-huh.

18 |        JD:  Okay?  If you haven't got them

19 | within an hour, give it another hour, and check your

20 | spam box, because sometimes with Yahoo, they send them

21 | directly to spam, not sure why.  And then if you still

22 | don't have it, you can give me a call.  I'll be here for

23 | another couple more hours.

24 |        DENISE MIRANDA:  Okay.

25 |        JD:  So feel free to give me a buzz, and

54

1  we'll, we'll figure out an alternative way to get you

2  the documents.

3        DENISE MIRANDA:  Okay.  Is there any

4  documents that I need to send right now?

5        JD:  Yeah.  I'll tell you what, why don't

6  you, when you send all that back, why don't you send

7  anything the IRS has given you, any of the notices, you

8  know, if you want to scan them and send them back or fax

9  them back.  All of my contact information is on the

10  documents.  Okay?  My, my direct line, my fax number, my

11  e-mail address, you'll have my e-mail address because

12  I'll be sending it to you through e-mail, my assistant's

13  e-mail address, and I'll send my supervisor, his contact

14  number, which is who you just spoke with.  So if you

15  need any, any information, you, you all, you can contact

16  any one of us.  We'll be able, we'll all be able to help

17  you out.

18        DENISE MIRANDA:  Okay.  Perfect.

19        JD:  Okay?

20        DENISE MIRANDA:  Okay.  So any documents

21  I need to send back, I can send back via fax or --

22        JD:  Yes, ma'am.  That's usually, that's

23  usually how we -- That's usually how I recommend it,

24  just simply because electronically things work great,

25  but sometimes, you know, e-mails just don't make it or

55

1  they don't get through like they're supposed to, but

2  faxes are, faxes work like nobody's business. We always

3  get those --

4            DENISE MIRANDA: Okay.

5            JD: -- so --

6            DENISE MIRANDA: All right. Perfect.

7            JD: All right?

8            DENISE MIRANDA: Okay.

9            JD: All righty.

10           DENISE MIRANDA: So I'll wait another

11 hour. Otherwise I'll call the 800 number again?

12           JD: Yeah, and with my extension, which

13 is --

14           DENISE MIRANDA: Okay.

15           JD: In fact, I'll tell you what, write

16 this down. This is my number and -- my direct number

17 and my extension.

18           DENISE MIRANDA: Okay.

19           JD: It's 1-888 --

20           DENISE MIRANDA: Uh-huh.

21           JD: 497.

22           DENISE MIRANDA: Okay.

23           JD: 5937.

24           DENISE MIRANDA: All right.

25           JD: And my extension is 3420.

56

1              DENISE MIRANDA:   Okay.   So that's JD

2    1(888) 497-5937.

3              JD:   Uh-huh.

4              DENISE·MIRANDA:   Extension 3420.·

5              JD:   Yeah..   Whenever you dial that

6    number, there's going to be a lady start shooting.

7    She's going to start talking.   It's a automated voice,

8              DENISE MIRANDA:   Yeah.

9              JD:   Soon as you hear her start talking,

10   you just punch in 3420.

11             DENISE MIRANDA:   Okay.

12             JD:   It will ring my phone directly.

13             DENISE MIRANDA:   Okay.   Perfect.

14             JD:   Okay?

15             DENISE MIRANDA:   Okay.   Thank you so

16   much, JD,   I appreciate it.

17             JD:   You're welcome, Denise.

18             DENISE MIRANDA:   Okay.   Have a good day.

19             JD:   You too.

20             DENISE MIRANDA:   Uh-huh.   Bye.

21

22

23

24

25

57

```
 1              I, Jane Damars, Certified Shorthand
 2   Reporter for the State of Texas, certify that the
 3   foregoing is a correct transcription from the audiotaped
 4   recordings in the above-entitled matter.
 5              I further certify that I am neither
 6   counsel for, related to, nor employed by any of the
 7   parties to the action in which this transcript was
 8   prepared, and further, that I am not financially or
 9   otherwise interested in the outcome of the action.
10              Certified to by me this 16th day of
11   April, 2010.
12                        _____
13                        Jane E. Demars, Texas CSR No. 2789
                          Expiration Date:  12-31-11
14                        Sunbelt Reporting & Litigation
                          Firm Registration No. 87
15                        1010 La Posada Drive, Suite 294
                          Austin, Texas 78752
16                        (512) 485-9100
                          Job No. 85288
17
18
19
20
21
22
23
24
25
```

# EXHIBIT C

STATE OF NORTH CAROLINA

COUNTY OF LINCOLN

## AFFIDAVIT

BEFORE ME, the undersigned notary public, on this day personally appeared Curtis J. Smith, Jr., who proved himself to be the person whose name is subscribed hereon through his driver=s license which contained his photograph and signature, and who after being by me duly sworn, upon his oath deposed and said:

AMy name is Curtis J. Smith, Jr. The following is true and accurate to the best of my recollection:

AA salesperson at Taxmasters, AOctavio,@ called me on August 28, 2009. Octavio told me that Taxmasters would not charge me for our conversation. Octavio transferred me to another Taxmasters= employee, who performed the Athird party verification@ and obtain my payment information. At no time during the call with Octavio, nor during the third party verification, was I told that the fees were non-refundable. Taxmasters also did not tell me that it would not begin working on my tax issue until I had paid its entire fee. After the call, Taxmasters removed the initial payment from my account, and then sent me the Taxmasters contract and some Powers of Attorney by email. I reviewed the contract, and did not like the terms. I did not sign and return the contract or the Powers of Attorney to Taxmasters. I called to cancel on August 31, 2009, which was the next business day after August 28, 2009. I spoke with Octavio, who transferred me to a voice mail box in the refunds division. I left a message, but no one at Taxmasters returned my call. I called again on September 1, 2009, and spoke again with Octavio. Octavio told me that he would send an email to the refund division on my behalf, and connected me again to the refund division. I left another message. No one from Taxmasters returned my call. I called the refund/billing division directly that afternoon, and again left a message. No one at Taxmasters returned my call. After this, I contacted my bank for assistance. I subsequently received a letter from E. Dewayne Logan, the VP of Quality Assurance at Taxmasters, dated October 26, 2009. A true and correct copy of that letter is attached to this affidavit. In that letter, Taxmasters refused to give me a refund of the $800.00 it had taken from me, and threatened to subject me to collection procedures if I did not pay it an additional $7,150.00. Taxmasters claimed that the Athird party verification@ during the Afree@ call on August 28, 2009 states that all fees are non-refundable. I have made attempts to obtain a refund of $800.00 that was charged to my credit card. I was never informed that all fees were non-refundable. I never signed a contract. I never signed a power of attorney. I was informed twice that the consultation fee was free. I was unable to talk to anyone about my refund.@

AFurther affiant sayeth not.@

Myrke J. Smith, Jr.

SUBSCRIBED AND SWORN TO before me on the 23 day of April, 2010.

Notary Public in and for the State of North Carolina

Henry A. Brassel, Jr.

MY COMMISSION EXPIRES  5/6/14